## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) **CRIMINAL NO. 07-10339-MLW** |
| | ) |
| **NYGELL JONES** | ) |

### RESPONSE TO § 2255 MOTION

The government respectfully responds herewith to defendant Nygell Jones's (the "defendant") Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody ("2255 Motion").

### FACTS

On October 17, 2007, the defendant Nygell Jones ("Jones") was charged by indictment with being a felon in possession of a 9mm semi-automatic firearm and various rounds of 9mm ammunition.  The evidence at trial showed the following.

**Government's Direct Case**

On August 3, 2007, four members of the Boston Police Youth Violence Strike Force – Sergeant James Tarantino, Officer Rance Cooley, and Massachusetts State Police Troopers William Cameron and Stephen Johnson – were patrolling in an unmarked police vehicle.  6/17 37-39, 85, 125; 6/23 I 40-41.[1]  At around 7:30 p.m. they were in the area of Thane Street in Dorchester and saw some teenage males unloading speakers from a car and taking them into the basement of 22 Thane Street.  6/17 39, 85, 125-26; 6/23 I 41-42.  When the officers asked what

---

[1]Citations to the trial record at in the form "[date of testimony] [page number(s)]."  There were two sessions on June 23, 2007, taken by different reporters.  For this date, the Roman numeral "I" after the date signifies the first session, and the Roman number "II" signifies the second session.

they were doing, they said they were having a party that night for the younger brother of one of them, and they asked if the police could stop by later that evening to check on the party.  6/17 40, 85-86, 126; 6/23 I 42.

At around 11:45 p.m. they drove down Thane Street and saw a very large crowd in the area of 22-24 Thane Street.  6/17 41, 58, 86, 126, 135; 6/23 I 42-43, 59-60.  As the officers approached the parking lot to that building, they saw a black male, whom none of them knew but who later was identified as the defendant, grab his waistband, a common area for carrying a gun. 6/17 41-42, 58, 87, 127, 135, 143-44; 6/23 I 43-44, 81.  Officer Cooley slowed the car and the others began to open the car doors. 6/17 43, 88; 6/23 I 44-45.  As they did so, the defendant, still grabbing his waist, ran to a basement door, knocking over or pushing through people waiting in line as he did so.  6/17 43, 88, 128, 136; 6/23 I 45-46.  The defendant ran into the basement and turned left, followed by Sergeant Tarantino and the two troopers.  6/17 44, 59, 89, 129; 6/23 I 46. There were 40 to 60 people in the basement.  6/17 60, 91.  The defendant ran the length of the basement and then tried to open a door, but it was locked.  6/17 44, 89; 6/23 I 47.  Sergeant Tarantino, concerned that the defendant was going to pull out a gun, tackled him, pinning the defendant's arms to his sides as he did so.  6/17 44-45, 59, 90; 6/23 I 47.[2]  They both hit the ground, and Sergeant Tarantino pulled the firearm out of the defendant's waist area.  6/17 45; 6/23 I 47-48, 62-63, 78.  The troopers then handcuffed the defendant with his hands behind his back.  6/17 45, 90, 99-102; 6/23 I 48.  The firearm was loaded at the time Sergeant Tarantino recovered it from the defendant.  6/17 45.

---

[2]Trooper Cameron's memory was that Sergeant Tarantino first felt for and yelled there was a gun, and that the two of them put the defendant on the ground.  6/23 I 47.

2

Meanwhile, when the other officers went into the basement, Officer Cooley, knowing that the police radios would not transmit from inside the basement, stayed outside.  6/17 129. Officer Cooley noticed another man at this time who was about 10 to 15 feet away, who took a firearm from his pocket, dropped it, and tried unsuccessfully to kick it under a car.  6/17 129-30, 135.  Officer Cooley arrested this man, who proved to be Camron Reese ("Reese").  6/17 130. Officer Cooley had no personal knowledge of what happened in the basement of 22 Thane Street that night.  6/17 137.

After recovering the firearm, the officers brought the defendant outside.  6/17 49, 91; 6/23 I 48.  The people who were in the basement were cooperative.  6/17 63, 91, 102-03.  The police did not get their names, except that Officer Cooley got the name of the male giving the party and this person's mother, and believed that the two brothers who later got arrested had been in the basement.  6/17 63-64, 103, 122-23, 137-38.  The officers' concern at the time was to get out of the basement with the defendant.  6/17 119.  Officer Cooley was standing on the other side of the parking with Reese when the others came out.  6/17 49, 91-92; 6/23 I 49.  Sergeant Tarantino told the troopers to take the defendant in front of 22-24 Thane Street to wait for transport, then went over to Officer Cooley.  6/17 50.  There was a .38 caliber revolver on the ground.  6/17 50, 91.  Sergeant Tarantino showed Officer  Cooley the firearm he had.  6/17 131. Sergeant Tarantino told Officer Cooley to take Reese to the front of the building, and he stayed with the revolver that was lying on the ground with the intent of having it photographed where it lay.  6/17 50-51, 93, 131.

Trooper Cameron took the defendant to the rear of the unmarked cruiser.  6/17 92-93; 6/23 I 49.  Officer Cooley took Reese to the same location.  6/17 93; 6/23 I 49.  Trooper Johnson

went to the back of the unmarked car as well.  6/17 92-93.  There was a large crowd, members of which started yelling at the officers.  6/17 93-94; 6/23 I 50.  The defendant broke away from Trooper Cameron and began running through the crowd with his hands cuffed behind his back, knocking people over as he ran.  6/17 94, 103-04, 132; 6/23 I 50-52.  Given the large crowd, Officer Cooley wanted to try to stay with the other officers, and he tried to follow by pulling Reese with him.  6/17 132.  Trooper Cameron chased and tackled the defendant, who either was tripping over two young women he had knocked over or was being brought down by Trooper Cameron when his head hit a low concrete retaining wall as he was falling to the ground.  6/17 94-95, 105, 132-33, 138; 6/23 I 52.

Meanwhile, as Sergeant Tarantino was standing over the revolver, he heard a commotion and saw the defendant running away from Trooper Cameron, so he picked up the revolver and went to the front of 22-24 Thane Street.  6/17 51.  As Sergeant Tarantino got in front of the building he saw some members of the crowd were kicking and punching the officers who were there.  6/17 52. The defendant was kicking and trying to get away from Trooper Cameron.  6/17 52, 95; 6/23 I 53.  Officer Cooley saw the defendant kicking Trooper Cameron, but then Reese tried to run in the opposite direction, and Officer Cooley's attention was focused on trying to ensure that Reese did not get away.  6/17 133.  Trooper Johnson went over to assist and threw to the ground a man who had hit Trooper Cameron.  6/17 95.   Somebody else struck Trooper Johnson.  6/17 95.  Trooper Johnson was fighting with these two men, who turned out to be brothers.  6/17 96; 6/23 I 54.  Trooper Cameron said "spray" and then deployed pepper spray at the two men fighting with Trooper Johnson.  6/17 96; 6/23 I 54.

Other police units started to arrive and helped to move the crowd back from the officers

and the prisoners, which now included the two brothers, who were arrested for attacking the officers.  6/17 52-53, 97, 133; 6/23 I 54-55.  A uniformed officer took custody of Reese, and Officer Cooley went to try to help disperse the crowd.  6/17 133-34.

At some point during the altercation the defendant stopped moving, was bleeding from the head, and appeared to Trooper Cameron to be unconscious.  6/17 53, 107; 6/23 I 55-56.  The officers sat him up and called for Emergency Medical Services, which treated the defendant at the scene and then took him to the hospital.  6/17 54, 98; 6/23 I 57.  The 23 minutes reflected in the EMS report was consistent with Officer Cooley's memory of how long the ambulance was at the scene.  6/17 140-41.  At trial, Sergeant Tarantino and Trooper Johnson did not recall the defendant's having two black eyes at the scene.  6/17 71-73, 107.

Trooper Johnson wrote a "use of force" report describing the physical force he used. 6/17 110-11.  Trooper Johnson testified that he independently wrote his report. 6/17 112. Trooper Cameron's "use of force" report had the same words describing much of what occurred that evening.  6/17 115-16.  Trooper Cameron testified that he did not copy anyone else's report. 6/23 I 65, 75.  Trooper Cameron testified that he and Trooper Johnson wrote their reports at the same time and were bouncing ideas off of one another.  6/23 I 67, 80-81.  Both reports had the same incorrect date at the top: 9/7/05.  6/17 117-18; 6/23 I 72-73.  Trooper Cameron indicated that the date probably came from a Boston Police Form 26 that had been saved.  6/23 80.

The police did not beat, kick, or intentionally trip the defendant that night.  6/17 75, 104-06, 139-40; 6/23 I 76-77.

The Boston Police Latent Fingerprint Unit attempted to develop latent fingerprints of value on the firearm, the magazine, and the rounds of ammunition.  6/23 I 21-22.  No prints of

potential value were developed on the firearm or on the ammunition, but a print of potential value was developed on the magazine that appeared to be from a fingertip. 6/23 I 25-27. Criminalist Rachael Lemery compared that print against prints taken from the defendant, including of his fingertips, but could neither identify nor exclude the defendant as having left the print. 6/23 I 27-28.

The parties stipulated that the defendant had a prior felony conviction; that the firearm was manufactured in Florida; that all of the rounds of ammunition were manufactured outside of Massachusetts; and that the firearm and rounds of ammunition met the definitions relevant to 18 U.S.C. Section 922(g)(1). 6/23 II 5-6.

**<u>Defense Case</u>**

Barbara Santos Silva testified that she worked as a recovery specialist at 26-28 Thane Street. 6/23 II 7-8. She was working from 4:00 p.m. to midnight on August 3, 2007. 6/23 II 10. When she came outside the area was taped off with yellow tape, there were many police cars and officers, and a lot of "chaos." 6/23 II 11, 25. She saw three men being arrested. 6/23 II 13. One who eventually was taken away in an ambulance had three or four officers in plain clothes around him and one of them tripped him. 6/23 II 13, 15, 25. The officers then proceeded to kick him countless times. 6/23 II 14. They kept asking him, "Where's the guns?" 6/23 II 15. Then the ambulance came and took him away. 6/23 II 15, 25.

Monique Cooper testified that she lived on the third floor of 30 Thane Street in Dorchester. 6/23 II 30-31. She was home the evening of August 3, 2007 and sometime between 11:00 p.m. and 1:00 a.m. she heard noises and saw lights. 6/23 II 32. She looked outside, observed people running around and screaming, and saw police officers hitting the defendant,

who had his hands cuffed behind him.  6/23 II 33.  The defendant went to the ground, and the police started kicking him.  6/23 II 33-34.  She went downstairs and eventually got to within six or seven feet of the defendant, who had a big gash on the side of his head and another near his ear.  6/23 II 36.  He was taken away on a stretcher.  6/23 II 36-37.

Ms. Cooper testified she saw the defendant being kicked and beaten in the alleyway between the second and third buildings away from her building.  6/23 II 39-40.  In May 2008 she testified in another proceeding that she saw somebody in a struggle with the police in front of her building or the alleyway between the buildings.  6/23 II 41.  She initially testified she had been referring to somebody other than the defendant.  6/23 II 41-42.  First she testified she had been referring to David Williams, and then testified she was not referring to him either but to a third person.  6/23 II 46-47.  She then testified that she had been referring to the defendant, and then again to David Williams.  6/23 II 50-51.  She testified that the person she saw fall to the ground and continue to be beaten was the defendant.  6/23 II 54.

**The Rebuttal Case**

Boston Police Sergeant John Earley was working as a patrol supervisor on a shift beginning at 11:45 p.m. on August 3, 2007 and ending at 7:30 a.m. on August 4, 2007.  6/23 II 65-66.  He responded with all available officers to a call for officer assistance on Thane Street. 6/23 II 66.  When he arrived, there was a large crowd, several plainclothes officers, and the defendant laying propped up against a retaining wall in front of 22 Thane Street.  6/23 II 66-68. The officers appeared to be standing around him, keeping an eye on the crowd.  6/23 II 67. Nobody was hitting, tripping, punching, or kicking the defendant.  6/23 II 67-68.  There was no yellow police tape up when Sergeant Earley arrived.  6/23 II 68.  After he arrived, he assigned

several officers to start putting it up.  6/23 II 68.

Boston Police Officer Adrian Worrell was one of the officers who responded to the call for assistance at Thane Street.  6/23 II 72-73.  When he arrived, he saw a young black male being guarded by two troopers.  6/23 II 73.  Officer Worrell did not see anybody hit, trip, or strike this person.  6/23 II 74.  When Officer Worrell arrived, there was no yellow tape; he assisted in putting it up after he arrived.  6/23 II 74.

### Officer Cooley Credibility Determination

As part of Ground Two of his Motion, the defendant notes that on March 14, 2006, in *Commonwealth v. Marshawn Garden,* a judge of the Boston Municipal Court "d[id] not credit at all Cooley's testimony that he saw the muzzle of a gun through a partially open back seat, when he was searching the passenger compartment of a Honda."  In anticipation of a trial in this case, government counsel made efforts to learn whether *Giglio* material existed with respect to Officer Cooley.  Affidavit of Robert E. Richardson ("Aff.") ¶ 2.  Counsel caused two inquiries to be made of the Boston Police Department, seeking with respect to Officer Cooley, among other things, any finding of misconduct reflecting on truthfulness or possible bias, any credible allegation of misconduct reflecting on truthfulness or possible bias that was the subject of a pending investigation, and any allegations that could not be substantiated, were found to be not credible, or which resulted in Officer Cooley's exoneration insofar as the allegations reflected on truthfulness or bias and were made by a prosecutor, magistrate judge, or judge. *Id.*  The first inquiry was made on November 26, 2007, and the second on May 14, 2008, the day the Court set trial in this matter for June 9, 2008 (subsequently rescheduled to June 16, 2008). *Id.*  On both occasions the Boston Police Department responded "none" with respect to each category of

information.  *Id.*

Counsel also sent internal emails on March 18, 2008 and May 16, 2008 to the criminal Assistant United States Attorneys within the office seeking *Giglio* information of which anybody was aware regarding Officer Cooley.  *Id.* ¶ 3.  To the best of counsel's belief, he did not receive any responses to either email.  *Id.*

Counsel also believes he conducted a Westlaw search to see if he could find any cases in which the four officers present the night of the defendant's request had been the subject of negative credibility findings, including Officer Cooley.  *Id.* ¶ 4.  Counsel's best memory is that defense counsel asked particularly about the other three officers and that he did the Westlaw search as part of an inquiry before advising counsel on March 27, 2008, that he had made inquiry and been advised that none of the other three officers had been the subject of a disciplinary or judicial finding that reflects negatively upon his truthfulness.  *Id.*  His best memory and belief is that he did the same Westlaw inquiry with respect to Officer Cooley and did not identify any negative credibility determinations.  *Id.*

Because counsel did this search on or before March 27, 2008, he did not see *Commonwealth v. Garden,* 451 Mass. 43, 49 (2008), which was decided on April 1, 2008 and in which the Supreme Judicial Court noted that the judge below in that case "was careful in his findings to point explicitly to those portions of Officer Cooley's testimony that he did not credit . . . ."  *Id.* ¶ 5.  In the decision below, which apparently is not part of the Westlaw database, the judge stated that he "d[id] not credit at all Cooley's testimony that he saw the muzzle of a gun through a partially open back seat . . . ."  *Id.*  The government was not aware of this determination at the trial of this case and therefore did not disclose it.  *Id.*

9

**Defendant's Warrant Status**

In the Motion the defendant contends "that at least some (if not all) of the members of the Youth Violence Strike Force knew exactly who he was, when they identified him in the crowd of party-goers on the night of his arrest (August 3, 2007), and they specifically targeted him as an absconder [from federal supervised release] who needed to be apprehended (with the added/planted consequence of being found to be in the possession of a firearm)."  The defendant asks the Court to consider that "about one month prior to the night of the defendant's arrest/apprehension the Boston Herald displayed the defendant's name and picture in an array of Boston's 10 Most Wanted Fugitives on its front page."  Motion at Continuation Page for Ground One.  The defendant apparently is referring to the article retrieved from the Boston Herald.com archives and attached to the affidavit filed herewith, in which the following information was provided regarding the defendant:

> WANTED FOR BREAKING AND ENTERING, GUN CHARGES IN DORCHESTER: NYGELL JONES, 27, 5-foot10 [end of line cut off]
>
> Nygell Kevin Jones is wanted for a number of gun, assault, breaking and entering and motor vehicle charges.

Aff. ¶ 6.  The information that appeared in the Herald appears to have been based on the defendant's interactions with, and matters being investigated by, local police, including the Boston Police Department, rather than a warrant issued based in connection with his federal supervised release.  *Id.*  One of these matters, in particular, is reflected in the Boston Police Department report attached to the affidavit, which says, among other things, with respect to an incident occurring on March 13, 2007:

> RESPONDED TO A RADIO CALL FOR A PERSON WITH A GUN AT 345 COLUMBIA ROAD.  WHILE EN ROUTE TO 345 COLUMBIA ROAD,

OFFICER ROSS FROM THE VK07 OBSERVED A BLACK MALE ABOUT 5'8 WEARING A WHITE LONG SLEEVE T-SHIRT AND HAIR IN PONY TAILS RUNNING UP BEHIND 333 COLUMBIA ROAD TOWARDS HAMILTON STREET.  OFFICER CEPEDA THEN OBSERVED THE SAME MALE RUN BEHIND 23 HAMILTON STREET INTO THE BACK YARD. OFFICERS FOLLOWED THE MALE ON FOOT AS HE JUMPED SEVERAL FENCES AND RAN THROUGH SEVERAL BACK YARDS.  OFFICER BAILEY THEN OBSERVED THE SAME MALE WHO[] HAD JUST TAKEN OFF HIS WHITE SHIRT AND NOW HAD ON A BLACK T-SHIRT JUMP ANOTHER FENCE INTO THE REAR OF 26 RICHFIELD STREET.  OFFICER LAI  K [SIC] KELLY ENTERED THE REAR OF 26 RICHFIELD STREET ANE OBSERVED THE SAME BLACK MALE EXITING THE CELLAR OF THE HOUSE.  SUSPECT WAS THEN ASKED IF HE RESIDED AT 26 RICHFIELD STREET.  HE STATED "NO 333 COLUMBIA ROAD" AS HE WAS GASPING FOR BREATH.  SUSPECT PLACED UNDER ARREST FOR B/E ENTERING AND TRESPASSING.

\*          \*          \*

OFFICER ROSS SPOKE TO THE HOME OWNER WHO[] IS KNOWN TO THE COMMONWEALTH WHO STATED HE WAS IN THE REAR YARD WORKING ON A MOTOR VEHICLE WHEN A BLACK MALE WITH A BLACK T-SHIRT ON JUMPED THE FENCE AND SAID "SHH" MA[D]E A MOTION TO BE QUIET AND THEN ENTERED HIS CELLAR.

*Id.*

The report indicates that the police were not able to locate the 911 caller that day.  *Id.*  On March 14, 2007, however, Detective Schroeder spoke to her.  *Id.*  According to the report:

The female victim stated to Detective Schroeder that she and the suspect had a verbal argument after she rejected him.  The victim continued to state that he must have liked the way I looked.  The victim got inside of her motor vehicle and the suspect was banging on the driver's side window stating move your shit from the front of my house.  The suspect was banging on the window with a silver handgun the victim believes to be a revolver.

*Id.*

The report further indicates that, on March 14, 2007, a man from a construction company turned in to the Boston Police a handgun that had been found in a construction yard at 36 Westwood Street, Westwood Street being a street that runs off of Richfield Street.  *Id.*

11

According to the Boston Police Ballistics Unit, the firearm that was turned in was a gray .40 caliber semi-automatic gun.  *Id.*  According to the Latent Print Section, one print of potential value was found on the firearm but the examiner, in comparing it to the prints of the defendant, could neither identify nor eliminate the defendant as having left the print.  *Id.*

The report further indicates that the victim was shown a photo lineup consisting of eight photographs on May 10, 2007, and selected a photograph of the defendant.  *Id.*

Review of a Massachusetts Criminal History Systems Board record for the defendant that appears to have been printed on August 21, 2007, it appears that a warrant had issued for the defendant on an "operating after" case in Quincy District Court on or about July 20, 2007; a warrant had issued for him in the Roxbury District Court for an "operating after" case on or about June 12, 2007; and that the defendant had defaulted in Dorchester District Court on or about May 14, 2007 with respect to the breaking and entering and trespassing case resulting from the events of March 13, 2007.  Aff. ¶ 7.

## ARGUMENT

28 U.S.C. § 2255 enables a federal prisoner collaterally to attack his conviction and sentence pursuant to which he is imprisoned.  *United States v. Haymen*, 342 U.S. 205 (1952).  "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  *United States v. Frady*, 456 U.S. 152, 166 (1982).  "A presumption of finality attaches to criminal convictions once all direct appeals have been exhausted."  *Singleton v. United States*, 26 F.3d 233, 236 (1st Cir. 1994).  In order for relief to lie under § 2255, the claimed error must be jurisdictional, constitutional, "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary

demands of fair procedure." *United States v. Addonozio*, 442 U.S. 178, 185 (1979); *Hill v. United States*, 368 U.S. 424, 428 (1962). "[P]ost conviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness." *Singleton*, 26 F.3d at 236.

In light of this high bar, evidentiary hearings are rare in § 2255 actions, and collateral review is available for only a narrow range of issues. As to the former point, "in most situations, motions can be 'heard' effectively on the papers, with the parties submitting evidentiary proffers by means of affidavits, documentary exhibits, and the like." *United States v. McGill*, 11 F.3d 233, 225 (1st Cir. 1993) (hearing unnecessary "when a § 2255 motion is conclusively refuted as to the alleged facts by the files and records of the case"). A petitioner seeking an evidentiary hearing must demonstrate a need for special treatment. *See, e.g., McGill*, 11 F.3d at 225; *United States v. Panitz*, 907 F.2d 1267, 1273-74 (1st Cir. 1990).

As shown below, each of the defendant's grounds for relief should be denied without a hearing.

**The Court Should Deny the Motion as to Ground One**

The defendant describes Ground One of his Motion as follows: "Conviction obtained by the use of evidence that was illegally planted on the defendant pursuant to an unconstitutionally alleged search and seizure." Motion at 5. In support of this, the defendant essentially claims that he has a history of gun cases with the Boston Police that have ended up being prosecuted federally, that he has had significant success in defending these cases, and that at least some members of the Youth Violence Strike Force who arrested him "knew exactly who he was . . . and they targeted him as an absconder who needed to be apprehended (with the added/planted

consequence of being found in the possession of a firearm.)"  Continuation Page for Ground One.    First and foremost, this claim is untimely.  As discussed below, the defendant does not provide his own version of events in which he affirmatively claims that he had no gun that night and that the police planted it on him.  However, assuming that he had made that claim, it was known to him at the time of his arrest.  In a case where, as here, no direct appeal is taken, a judgment of conviction becomes "final" when the time to appeal – in this case, ten days – expires.  *See, e.g., Ramirez v. United States,* 146 Fed.Appx. 325 (11th Cir. 2005); *Akins v. United States*, 204 F.3d 1086, 1089 n.1 (11th Cir. 2000); *Kapral v. United States,* 166 F.3d 565, 577 (3d Cir. 1999).  Since the defendant's judgment entered on October 6, 2008 and the defendant did not appeal, the time for him to raise this issue expired one year later and ten days later, or October 16, 2009.  *See* 28 U.S.C. § 2255(f)(1).  Since the effective filing date of the Motion is May 7, 2010 (*see* Docket Entry 103), the Motion is untimely as to this ground.

In explaining why he did not raise this issue on direct appeal, the defendant asserts that he was not aware of the newly discovered fact that some of the officers were found to have perjured themselves in *United States v. Darwin Jones*, 609 F.Supp.2d 113 (D.Mass. 2009), until November 11, 2009.  But this determination was not made until after the defendant's trial.  As the Appeals Court of Massachusetts recognized in *Commonwealth v. Villatoro,* 76 Mass.App.Ct. 645, 649 (Mass.App.Ct. 2010), "[w]hile we recognize that the Commonwealth's duty to present honest testimony properly supporting charges is paramount, we do not impose a duty on prosecutors based upon events that have not yet transpired."  Moreover, the material resulting in the inquiry that led this Court in the Darwin Jones case to conclude that the troopers had testified falsely – the troopers' "use of force" reports – was disclosed in this case and was the subject of

14

cross-examination and argument at the defendant's trial.

In addition to being untimely, the claim is not sufficiently articulated.  In *Moreno-Morales v. United States,* 334 F.3d 140, 145 (1st Cir. 2003), the First Circuit reaffirmed that, in the face of an effort to have a claim dismissed without an evidentiary hearing, a 2255 petitioner's sworn allegations are accepted as true "unless those allegations are merely conclusory, contradicted by the record, or inherently incredible," quoting *Ellis v. United States,* 313 F.3d 636, 641 (1st Cir. 2002).  Here, the defendant's claim that the officers planted the gun on him is not supported by any affirmative exposition on his part, other than the conclusory description of his claim at page 5 of him Motion.  Indeed, rather than saying affirmatively that the gun was planted, the defendant's claim appears more to be that, because the officers purportedly knew him (although the defendant does not affirmatively say *he* knew *them*), because they purportedly had a reason to dislike his general success in defending gun charges, and because they have been found to have testified untruthfully, "it isn't a far stretch to believe that said firearm was indeed actually planted on [the defendant]."  This is a far cry from explaining what, according to the defendant, actually happened at 22-24 Thane Street that night.

Indeed, at least part of the defendant's claim is illogical.  He suggests that the officers did not tell the truth when they testified they did not know him before that night and that instead at least some of them did recognize him "and . . . specifically targeted him as an absconder who needed to be apprehended . . . ."  Continuation Page for Ground One.  First, as described above, as of August 3, 2007 there actually were state warrants for the defendant's arrest, and he had defaulted on a court appearance in Boston with regard to the breaking and entering and trespassing charges stemming from the events of March 13, 2007.  The officers' testimony at

trial would have been particularly straightforward if they *had* recognized him and *had* known that there were warrants extant for his arrest: in that situation, of course, they could have arrested him on the warrants and would have recovered the gun as part of a search incident to arrest. There simply would have been no logical reason for them to have claimed otherwise.

Moreover, not only does the defendant fail affirmatively to state in his Motion that the gun was planted, but, the government would argue, he virtually admitted to the possession in the revocation proceeding before Judge Young on November 25, 2008, a copy of which is attached. The government says "virtually" because, having reviewed the transcript, it recognizes that the defendant never affirmatively admitted the conduct for which he was convicted before this Court. As the attached affidavit indicates, the defendant was alleged by Probation to have committed three violations of his supervised release, the third of which was that he had violated the condition that he not commit another federal, state, or local crime by engaging in the conduct at issue in this case. Aff. ¶ 8. In the hearing before Judge Young, he simply "agree[d] that [he] did violate the terms of [his] supervised release." Hearing at 3. The government believes nonetheless that it was clear to everyone, including the defendant, that the real conduct at issue was the conduct for which he was convicted in this case. For example, the government filed a sentencing memorandum in which, in arguing for the need for specific deterrence, it argued that the defendant had shown that Judge Young's prior sentence of 41 months had proved insufficient to dissuade him from committing precisely the same crime again, i.e., the conduct underlying his conviction before this Court. *United States v. Jones,* Crim. No. 03-10248-WGY, Docket Entry 69 at 6. During the hearing itself, the government observed that "the defendant [is] before the Court for revocation . . . based on his second conviction in this district for being a felon in

16

possession of a firearm." Hearing at 4. In arguing for a lower sentence than that advocated by the government, defense counsel stated the following, clearly referring to the conduct underlying the defendant's conviction before this Court:

> We do not mean to trivialize the offense at all. Gun possession is a serious crime that should not be taken lightly. But a close examination of the facts in this case will reveal that there was no evidence of Mr. Jones trying to harm anyone or threaten anyone with a gun. He was not brandishing it to anyone.

Hearing at 7. And in addressing Judge Young himself, the defendant said, among other things:

> All I can really say is I'm embarrassed really. I got up and I spoke before you and I promised to do things that I fell short of doing. . . . Obviously just me and having my freedom wasn't enough to convince me to do the right thing. I tried, but the only thing I can say is that I failed.

Hearing at 9. Again, while the defendant did not explicitly reference the conduct for which he was convicted before this Court, the government believes that, in the context of the hearing as a whole, the failure to which the defendant was referring was clearly his possession of the firearm in this case. This obviously is inconsistent with his conclusory claim here that the gun was planted.

Finally, it is not clear that this claim is cognizable under § 2255. It really is an argument for a finder of fact. Very able defense counsel argued in closing that the jury should not believe the testimony of the three officers present in the basement that the gun was recovered from the defendant. 6/23 II at 100-110. The jury rejected this argument as to how the officers' testimony should be evaluated. The claim has no place in a 2255 petition.

Accordingly, the Court should deny the claim set forth in Ground One.

**The Court Should Deny the Motion as to Ground Two**

In Ground Two, unlike in Ground One, the defendant has identified information that the government, despite inquiry, was not aware of and therefore did not disclose: the statement by Judge Dougan that he did not credit at all Officer Cooley's testimony that he could see part of a firearm from a certain vantage point. Nonetheless, the Court should deny this aspect of the Motion without a hearing.

In order to obtain relief under § 2255 based on the failure to disclose impeachment material,

> A petitioner must demonstrate that suppressed evidence is "material," that is, that "its suppression undermines confidence in the outcome of a trial." *United States v. Bagley,* 473 U.S. 667, 678 (1985); *Barrett v. United States,* 965 F.2d 1184, 1189 (1st Cir. 1992). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995).

*Moreno-Morales,* 334 F.3d at 146. Here, the information regarding Officer Cooley was not material.

First, had the government learned of this information before trial, it certainly would have disclosed it. The government would also, however, have moved *in limine* to exclude questioning regarding it at trial. In *United States v. Lopez,* 944 F.2d 33 (1st Cir. 1991), the defendant had sought to cross-examine a police officer regarding his testimony in an unrelated case in which a different judge had disbelieved his testimony. 944 F.2d at 37. The district judge had excluded the inquiry under Rule 403. *Id.* at 38. The First Circuit noted that it was hampered by the failure of the defendant to provide an offer of proof. *Id.* The court, under the circumstances, upheld the

apparent view of the district court that,

> while potentially probative of the officer's testimony, the
> credibility assessment made by the presiding judge at an unrelated
> trial would have entailed a grave risk that the jury might adnegate
> its exclusive responsibility to determine the credibility of the
> testimony given by the officer at [the defendant's] trial. [Citation
> omitted].

*Id.*

Other courts have split on the issue of whether it is permissible to question a witness

regarding a negative credibility finding by a judge or other factfinder in a different proceeding.

For example, in *United States v. Davis*, 183 F.3d 231 (3d Cir. 1999), the Third Circuit, in

describing in part the extent to which a defendant, who happened to be a police officer, could be

cross-examined on retrial, it stated:

> This [a ruling that the government could inquire about certain acts
> going to truthfulness] does not suggest that the government may
> introduce either reports or evidence that [the defendant] was
> suspended for forty-four days, or documentation of the Internal
> Affairs determination that [the defendant] lied about the subway-
> pass incident.  Such evidence would not only be hearsay to the
> extent it contains assertions of fact, it would be inadmissible
> extrinsic evidence under Rule 608(b).  More precisely, the
> government cannot make reference to [the defendant's] forty-four
> day suspension or that Internal Affairs found that he lied about the
> subway-pass incident.  The government needs to limit its cross-
> examination to the *facts underlying* those events.  To impugn [the
> defendant's] credibility, the government properly can question [the
> defendant] about misappropriating departmental gasoline for
> personal use and putting a false name in a gas log, and it may
> question [the defendant] about lying to an Internal Affairs officer
> about ripping up an individual's subway pass.  If he denies that
> such events took place, however, the government cannot put before
> the jury evidence that he was suspended or deemed a liar by
> Internal Affairs.  As Professor Saltzburg aptly warns, "counsel
> should not be permitted to circumvent the no-extrinsic-evidence
> provision [in rule 608(b)(1)] by tucking a third person's opinion
> about prior acts into a question asked of the witness who has

19

denied the act."  Stephen A. Saltzburg, *Impeaching the Witness: Prior Bad Acts and Extrinsic Evidence.* 7 CRIM. JUST. 28, 31 (Winter 1993).  Allowing such a line of questioning not only puts hearsay statements before the jury, it injects the views of a third person into the case to contradict the witness.  This injection of extrinsic evidence not only runs afoul of Rule 608(b), but also sets the stage for a mini-trial regarding a tangential issue of dubious probative value that is laden with potential undue prejudice.

*Davis,* 183 F.3d at 257 n. 12 (emphasis in original).

Indeed, the Advisory Committee Notes for the 2003 Amendments to Rule 608 cited with approval both the *Davis* opinion and the Saltzburg article, quoting in the parenthetical for the latter the Saltzburg view that "counsel should not be permitted to circumvent the no-extrinsic-evidence provision by tucking a third person's opinion about prior acts into a question asked of the witness who has denied the act."

As noted previously, however, other courts have reached a different view.  For example, in *United States v. Whitmore,* 359 F.3d 609619-23 (D.C. Cir. 2004), the D.C. Circuit held it reversible error to preclude cross-examination of the sole witness connecting the defendant to a gun regarding a prior judicial finding that the witness had lied.  In ruling on the government's petition for rehearing, however, the court, while chiding the government for failing to raise the issue earlier, nonetheless called the district court's attention to the Advisory Committee note "because that note would apply to the scope of cross examination on retrial."  *United States v. Whitmore,* 384 F.3d 836, 837 (D.C. Cir. 2004).

Other courts have disagreed with the notion that the mention of a credibility finding by a fact-finder in a separate proceeding, in the form of a question, constitutes "extrinsic evidence" prohibited by Rule 608(b).  *See, e.g., United States v. Nelson,* 365 F.Supp.2d 381, 389-90 (S.D.N.Y. 2005)(citing Second Circuit cases permitting cross-examination regarding such

20

determinations), *aff'd in part, vacated in part, remanded by* 193 Fed.Appx. 47 (2d Cir. 2006).

Writing for the Seventh Circuit, for example, Judge Ponsor questioned the weight to be given

both the Advisory Notes and their reliance on the Saltzburg article, and stated that "there is

nothing to suggest that the 'inquiry' [regarding whether a witness had lied in two prior

suppression hearings] could not have extended to asking the witness whether a judge, say, had

ever found him not to be a credible witness." *United States v. Dawson,* 434 F.3d 956, 958 (7th

Cir. 2006).

       In the government's view, the correct analysis is that suggested by the First Circuit's

*Lopez* decision, the Third Circuit's *Davis* opinion, and the Advisory Committee notes.  Under

this view, had the information regarding Officer Cooley been disclosed, the most that the

defendant could have asked him is whether he testified falsely in the *Garden* case, a proposition

that he plainly would have denied.  Moreover, even had the defendant been permitted to ask

Officer Cooley whether Judge Dougan had "not credited at all" a portion of his testimony in a

suppression hearing, this would not have been material.  Indeed, in light of the Supreme Judicial

Court's recognition in *Garden* that Judge Dougan had credited some of Officer Cooley's

testimony, the government presumably could have gotten that before the jury.

       The undisclosed impeachment material in this case also was not material because of

Officer Cooley's role in the trial.  Unlike the *Whitmore* case, where the witness in question was

the sole witness testifying to the defendant's connection to the gun, here Officer Cooley did not

testify to that at all: he was the only one of the four officers that night who did not go into the

basement and see what occurred there.  Moreover, while he did testify to seeing the defendant

run from Trooper Cameron, strike the retaining wall with his head, and then kick at the trooper,

Officer Cooley's testimony regarding the struggle on the sidewalk was limited given Officer Cooley's efforts to prevent his own witness, Reese, from fleeing.

Officer Cooley's limited role in the case is reflected in the parties' closing arguments. Unless the government misses its count, it mentioned Officer Cooley only once in its closing argument, as having recovered a gun from Reese.  6/23 II 85.  The defendant appears to have mentioned him twice: once with respect to the officer's testimony about how the defendant was injured, and once with respect to the officer's having spoken to the young man who was giving the party and his mother.  6/23 II 100, 107.  By far the bulk of the defendant's closing was aimed at the three officers – Sergeant Tarantino and the two troopers – who were present in the basement when the gun was recovered from the defendant.  6/23 II 100-110.  In rebuttal, in response to the suggestion that the other officers had fabricated recovering the gun from the defendant in the basement, the government argued, in part, that Sergeant Tarantino showed Officer Cooley the gun when they initially came out of the basement, but otherwise did not refer to Officer Cooley.  6/23 II 114.

Similarly, the defendant argued after trial that this Court should enter a judgment of acquittal or, in the alternative, order a new trial because the three officers who had been in the basement had provided false testimony and thus their testimony that the gun was recovered from the defendant was insufficient to support the verdict.  Docket Entry 71.  The motion did not concern Officer Cooley.

In short, of the four officers who testified at the trial, Officer Cooley was the least important to the government's case.  In such circumstances, the information regarding Judge Dougan's assessment of some (but not all) of Officer Cooley's testimony in *Garden* is not

material.

Accordingly, the Court should deny Ground Two.

**The Court Should Deny the Motion as to Ground Three**

Finally, the Court should deny the defendant's claim as set forth in Ground Three without a hearing.

The defendant alleges in Ground Three that his trial counsel engaged in ineffective assistance of counsel.  Under the test enunciated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), in order to prevail on his ineffective assistance of counsel claim, the defendant must establish (1) that "counsel's performance was deficient . . . [which] requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "that the deficient performance prejudiced the defense . . . [which] requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687; s*ee also Bucuvalas v. United States*, 98 F.3d 652, 658 (1ˢᵗ Cir. 1996) (observing that defendant's burden of proving both prongs is "heavy").

Under the first prong, the defendant must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 687-88; *see also Murchu v. United States,* 926 F.2d 50, 58 (1ˢᵗ Cir. 1991) (*accord*).  Due to the wide range of competent representation, the innumerable strategic decisions defense counsel might face, and that defendants are often tempted to second-guess counsel's assistance after an adverse result, judicial scrutiny of trial counsel's performance "must be highly deferential" and "a court must indulge in a strong presumption that counsel's conduct falls within the range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation omitted); *see also Matthews v. Rakiey*, 54 F.3d 908, 916 (1ˢᵗ Cir. 1995) (*accord*).

Applying the *Strickland* standard, the First Circuit has emphasized that "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of a reasonably effective assistance under the circumstances then obtaining." *United States v. Natanel*, 938 F.2d 302, 309-10 (1ˢᵗ Cir. 1991); *see also Arroyo v. United States*, 195 F.3d 54, 55 (1ˢᵗ Cir. 1999) (noting that "counsel is not incompetent merely because he may not be perfect.  In real life, there is room not only for differences in judgment but even for mistakes, which are almost inevitable in a trial setting, so long as their quality or quantity do not mark out counsel as incompetent.")  Like the Supreme Court, the First Circuit has emphasized that the performance standard "is to be applied not in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." *Natanel*, 938 F.2d at 309; s*ee also Lema v. United States*, 987 F.2d 48, 51 (1ˢᵗ Cir. 1993) (observing that habeas court must evaluate challenged conduct "from counsel's perspective at the time" and must make every effort "to eliminate the distorting effects of hindsight") (citations omitted).

Under the second prong of the *Strickland* test, the defendant must prove prejudice, *i.e.*, that his attorney's errors "actually had an adverse effect on the defense," and not merely that they "had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.  He must show that a "reasonable probability" exists that "but for counsel's unprofessional

errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Matthews,* 54 F.3d at 916 (*accord*).  The *Strickland* court further noted that courts "must consider the totality of the evidence before the judge or jury . . . [and] a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96; *see also United States v. Jackson*, 918 F.2d 236, 243 (1ˢᵗ Cir. 1990) (holding that defendant was not prejudiced where "there was overwhelming evidence" of actual guilt).

The particular fault the defendant finds with counsel is failing to "investigate enough of the numerous potential witnesses who were obviously in a cognizable enough position to have been able to perceive any viable enough relevant details, which would have aided and assisted in the impeachment of the government's only witnesses . . . ."  Motion at 8.  The defendant has at least three problems with this allegation, however, each of which is fatal to his claim.

First, the defendant was aware at the end of the trial that his attorneys had called just two witnesses to testify about what they saw the night of August 3.  He certainly says nothing in the Motion to suggest he more recently came into information bearing on this claim.  The defendant thus had until October 16, 2009, to raise the claim.  He did not raise it until May 2010, and that is too late.

Second, the claim is devoid of any specifics.  The defendant does not point to anybody the attorneys purportedly failed to interview who actually claims to have information that could have assisted in the impeachment of the witnesses.  Indeed, the defendant faults the attorneys for failing to investigate whether any of the government's witnesses "could have been discovered as

having known (or at least known of) the defendant,"[3] but if any of the witnesses knew *him* he presumably knew *them*, and he could have provided this information himself.  By providing only conclusory claims bereft of any factual support, the defendant cannot carry his burden of showing that his attorneys' performance was deficient in this or any other respect.  To the contrary, the available evidence, in the form of the attorneys' courtroom performances, suggests that their work for the defendant fell well within the range of reasonable professional assistance.

Finally, given the failure to point to a single witness whom counsel failed to interview, and given the failure to provide any information as to what any such witness would have testified to or told counsel in aid of cross-examination of the government's witnesses, the defendant has failed utterly to establish prejudice, that is, a reasonable probability that, but for his attorneys' purported errors, the result of the trial would have been different.

Accordingly, the claim presented in the third Ground should be denied without a hearing.

---

[3]And again, it simply would have made no sense for the witnesses to claim they did not know the defendant if in fact they did.  Had they known of the federal or state warrants against him they could have arrested him on that basis and recovered the firearm as part of the arrest process.

**<u>CONCLUSION</u>**

For the foregoing reasons, the defendant's Motion should be denied in its entirety without a hearing.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney


By:
<u>/s/Robert E. Richardson</u>
ROBERT E. RICHARDSON
Assistant U.S. Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I, Robert E. Richardson, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 28, 2010.  Specifically, a paper copy will be sent to Nygell Jones, Pro Se, Reg. No. 22699-038, F.C.I. Schuylkill, P.O. Box 759/Unit 1A, Minersville, PA 17954.


<u>/s/Robert E. Richardson</u>
ROBERT E. RICHARDSON